**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **TAJA PARKER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 2:24-cv-007-CWB** |
| | ) | |
| **MARTIN J. O'MALLEY,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

**I.      Introduction and Administrative Proceedings**

Taja Parker ("Plaintiff") filed an application for Disability Insurance Benefits under Title II of the Social Security Act and an application for Supplemental Security Income under Title XVI of the Social Security Act on July 29, 2021—alleging disability onset as of May 28, 2021 due to diabetes and neuropathy.  (Tr. 88, 147-48, 157-58).[1]  The claim was denied at the initial level on March 30, 2022 and again after reconsideration on September 13, 2022.  (Tr. 88, 147, 155-57, 165-67, 173-75, 186-87).  Plaintiff then requested *de novo* review by an administrative law judge ("ALJ").  (Tr. 88, 234, 247).  The ALJ subsequently heard the case on April 25, 2023 (Tr. 88, 119-46), at which time testimony was given by Plaintiff (Tr. 122-40) and by a vocational expert (Tr. 141-45).  The ALJ took the matter under advisement and issued a written decision on June 6, 2023 that found Plaintiff not disabled.  (Tr. 88-113).

The ALJ's written decision contained the following enumerated findings:

1.   The claimant meets the insured status requirements of the Social Security Act through June 30, 2023.

---

[1] References to pages in the transcript are denoted by the abbreviation "Tr."

2.   The claimant has not engaged in substantial gainful activity since May 28, 2021, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   The claimant has the following severe impairments: insulin dependent diabetes mellitus, hypertension, neuropathy, anemia, depression, anxiety, somatoform disorder, and substance abuse disorder (marijuana)(not material) (20 CFR 404.1520(c) and 416.920(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except she can frequently push/pull with the upper and lower extremities bilaterally, but never climb ladders, ropes, and scaffolds or work at unprotected heights or with hazardous machinery, nor can she engage in any job that requires commercial driving. She can frequently climb ramps and stairs, as well as occasionally balance, and she is limited to frequent stooping, kneeling, crouching, and crawling.  She can frequently handle and finger on a bilateral basis.  She should avoid concentrated exposure [to] extreme cold, extreme heat, wetness, and vibration. She can frequently interact and respond appropriately with supervisors and coworkers and can frequently do so with customers and members of the general public. She can respond appropriately to work pressures in the usual work setting and to changes in a routine work setting if gradually introduced. She can use judgment in simple work-related decisions.  She can understand, remember, and carry out simple instructions.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   The claimant was born on May 25, 2000 (Ex. B2D) and was 21 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   The claimant has at least a high school education (Ex. B1E) (20 CFR 404.1564 and 416.964).

9.   Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from May 28, 2021, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 90, 91, 92, 96, 111, 112, 113).  On November 3, 2023, the Appeals Council denied Plaintiff's request for review (Tr. 1-6), thereby rendering the ALJ's decision the final decision of the Commissioner.  *See, e.g., Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).

Plaintiff now asks the court to reverse the final decision and remand the case for a new hearing and further consideration.  (Doc. 10 at p. 12).  As contemplated by 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure, the parties have consented to the exercise of full jurisdiction by a United States Magistrate Judge (Docs. 6 & 7), and the court finds the case ripe for review pursuant to 42 U.S.C. §§ 405(g) & 1383(c)(3) in that the court construes Plaintiff's supporting brief (Doc. 10) as a motion for summary judgment and the Commissioner's opposition brief (Doc. 11) as a competing motion for summary judgment.  Upon consideration of the parties' submissions, the relevant law, and the record as a whole, the court concludes that Plaintiff's motion for summary judgment is due to be denied, that the Commissioner's motion for summary judgment is due to be granted, and that the final decision is due to be affirmed.

## II.    Standard of Review and Regulatory Framework

The court's review of the Commissioner's decision is a limited one.  Assuming the proper legal standards were applied by the ALJ, the court is required to treat the ALJ's findings of fact as conclusive so long as they are supported by substantial evidence.  42 U.S.C. § 405(g); *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997).  "Substantial evidence is more than a scintilla," but less than a preponderance, "and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158

(11th Cir. 2004) ("Even if the evidence preponderates against the Commissioner's findings, [a reviewing court] must affirm if the decision reached is supported by substantial evidence.") (citations omitted).  The court thus may reverse the ALJ's decision only if it is convinced that the decision was not supported by substantial evidence or that the proper legal standards were not applied.  *See Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  Reversal is not warranted simply because the court itself would have reached a contrary result.  *See Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).  Despite the deferential nature of its review, however, the court must look beyond those parts of the record that support the decision, must view the record in its entirety, and must take account of evidence that detracts from the evidence relied on in the decision.  *See Hillsman v. Bowen*, 804 F.2d 1179, 1180 (11th Cir. 1986); *see also Walker v. Bowen*, 826 F.2d 996, 999 (11th Cir. 1987).

To qualify for disability benefits and establish entitlement for a period of disability, a person must be unable to:

> engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).[2]  To make such a determination, the ALJ employs a five-step sequential evaluation process:

(1) Is the person presently unemployed?

(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 [the Listing of Impairments]?

---

[2] A "physical or mental impairment" is one resulting from anatomical, physiological, or psychological abnormalities that are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

(4) Is the person unable to perform his or her former occupation?

(5) Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability.  A negative answer to any question, other than step three, leads to a determination of "not disabled."

*McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986).  *See also* 20 C.F.R. §§ 404.1520 & 416.920.[3]

The burden of proof rests on the claimant through step four.  *See Phillips v. Barnhart*, 357 F.3d 1232, 1237-39 (11th Cir. 2004); *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). A claimant establishes a *prima facie* case of a qualifying disability once he or she has carried the burden of proof from step one through step four.  *Id*.  At step five, the burden shifts to the Commissioner, who must then show that there are a significant number of jobs in the national economy that the claimant can perform.  *Id*.

In order to assess the fourth and fifth steps, the ALJ must determine the claimant's Residual Functional Capacity ("RFC").  *Phillips*, 357 F.3d at 1238-39.  The RFC is what the claimant is still able to do despite the claimant's impairments and is based on all relevant medical and other evidence.  *Id*.  It may contain both exertional and nonexertional limitations.  *Id*. at 1242-43.  At the fifth step, the ALJ considers the claimant's RFC, age, education, and work experience to determine if there are jobs available in the national economy that the claimant can perform.  *Id*. at 1239.  To do so, the ALJ can use either the Medical Vocational Guidelines ("grids"), *see*

---

[3] *McDaniel* was an SSI case brought under Title XVI.  Nonetheless, because the same sequence applies to claims for disability insurance benefits brought under Title II, cases arising under Title XVI are appropriately cited as authority in Title II cases, and vice versa.  *See, e.g., Ware v. Schweiker*, 651 F.2d 408, 412 (5th Cir. 1981); *Smith v. Comm'r of Soc. Sec.*, 486 F. App'x 874, 876 n.* (11th Cir. 2012) ("The definition of disability and the test used to determine whether a person has a disability is the same for claims seeking disability insurance benefits or supplemental security income.").

20 C.F.R. pt. 404 subpt. P, app. 2, or call a vocational expert ("VE"). *Id*. at 1239-40. The grids allow the ALJ to consider factors such as age, confinement to sedentary or light work, inability to speak English, educational deficiencies, and lack of job experience. Each factor can independently limit the number of jobs realistically available to an individual, and combinations of these factors yield a statutorily-required finding of "Disabled" or "Not Disabled." *Id*. at 1240.

## III.    Issues on Appeal

Plaintiff raises one issue on appeal:  whether the ALJ erred in failing to order a consultative examination.  (Doc. 10 at p. 2).

## IV.    Discussion

"Social Security proceedings are inquisitorial rather than adversarial," and "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000). "Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record." *Graham*, 129 F.3d at 1422.[4] "This obligation requires the ALJ to develop the claimant's complete medical history for at least the 12 months preceding the month in which the application was filed, assist the Claimant in obtaining evidence from his or her treating sources, and order a consultative examination when such an examination is necessary to make an informed decision." *Rivera Perez v. Comm'r of Soc. Sec.*, No. 6:20-CV-79, 2021 WL 289052 at *2 (M.D. Fla. Jan. 28, 2021); 20 C.F.R. §§ 404.1512(b)(1)-(2), 416.912(b)(1)-(2).

---

[4] "The basic duty to develop the record rises to a 'special duty' where the claimant has not waived his or her right to representation and is not represented during the administrative proceedings." *Rivera Perez v. Comm'r of Soc. Sec.*, No. 6:20-CV-79, 2021 WL 289052 at *2 n.3 (M.D. Fla. Jan. 28, 2021) (citing *Brown v. Shalala*, 44 F.3d 931, 934-35 (11th Cir. 1995)) (emphasis added). Because Plaintiff was represented by counsel at the hearing (Tr. 34-74), the ALJ had only a basic duty to develop the record.

The ALJ's obligation to develop the record "exists even if the claimant is represented by counsel or has waived the right to representation." *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).  However, "[t]here must be a showing that the ALJ's failure to develop the record led to evidentiary gaps in the record, which resulted in unfairness or clear prejudice, before the court will remand a case for further development of the record." *Rodriguez-Torres v. Saul*, No. 8:18-CV-1982, 2019 WL 4267955 at *4 (M.D. Fla. Sept. 10, 2019), *aff'd sub nom. Torres v. Comm'r of Soc. Sec.*, 819 F. App'x 886 (11th Cir. 2020).  "At a minimum, clear prejudice 'requires a showing that the ALJ did not have all of the relevant evidence before him in the record ... or that the ALJ did not consider all of the evidence in the record in reaching his decision.'" *Rivera Perez*, 2021 WL 289052 at *3 (quoting *Kelly v. Heckler*, 761 F.2d 1538, 1540 (11th Cir. 1985)); *Thomas-Joseph v. Comm'r of Soc. Sec.*, No. 21-11020, 2022 WL 1769134 at *2 (11th Cir. June 1, 2022).

Plaintiff argues that the ALJ erred in failing to order a consultative medical examination because the medical record pertaining to her "diabetes related impairments, especially diabetic neuropathy, presented an extensive, complex and ambiguous record, such that a consultative examination was necessary for the ALJ to properly determine the nature and extent of [her] physical symptoms and limitations and their impact on [her] RFC."  (Doc. 10 at pp. 11-12). Plaintiff asserts that there were no consultative medical examinations in the record for the ALJ to consider and that the exhibits in the record did not provide the ALJ with sufficient, unambiguous, and adequate evidence to make an informed decision.  (*See id*. at p. 12).  The Commissioner contends that the ALJ did not need to obtain a consultative examination because the record already contained sufficient evidence for the ALJ to make a determination that Plaintiff was not disabled.  (*See* Doc. 11 at p. 4).

The evidence before the ALJ indeed was sufficient for the ALJ to properly assess Plaintiff's disability claim. In addition to Plaintiff's testimony, the ALJ also considered function reports, treatment records, and State agency medical consultants' prior administrative medical findings. The record reflects that the ALJ thoroughly considered Plaintiff's diabetes related impairments, including diabetic neuropathy. The ALJ found that the medical record "repeatedly" documented that Plaintiff's hospitalizations for diabetic ketoacidosis were due to medication noncompliance and that she responded "quickly" to treatment with insulin during her hospitalizations. (Tr. 91, 2151-52, 2209, 2317, 2496, 2526, 2536, 2546, 2553, 2734-35, 2742-43, 2745, 2748, 2750, 2752).

The ALJ discussed the treatment records at length as follows:

Around the time of the May 25, 2021 alleged onset date, the claimant presented to Baptist Medical Center South for complaints of arm and leg pain on May 28, 2021, she was found to be in diabetic ketoacidosis and admitted, and she reported experiencing stress from school and work (Ex. B3F at 184). **The claimant did "very well" with treatment for diabetic ketoacidosis**, Neurontin (gabapentin) helped her arm and leg pain, and **she was discharged on May 30, 2021 after her diabetic ketoacidosis resolved with treatment** (Ex. B3F at 184). Upon the claimant's discharge, **Jun Yoo, D.O. continued the claimant on gabapentin for diabetic peripheral neuropathy, thought that the claimant would "do very well" on an insulin pump,** and advised her to follow up with outpatient endocrinology for a possible insulin pump (Ex. B3F at 184).

**The claimant** visited Montgomery Family Medicine **on July 20, 2021 and reported that she was not checking her glucose regularly** and denied weight loss, fatigue, blurred vision, polydipsia, polyuria, and nocturia (Ex. B2F at 30). The claimant also reported stinging pain in her legs but did not want to increase her dosage of gabapentin (Ex. B2F at 30). The claimant was alert, oriented, and in no acute distress, **she had normal sensation, strength, coordination, and reflexes**, and her thought content and affect appeared normal (Ex. B2F at 31).

The claimant was admitted to Baptist Medical Center South intensive care unit on July 27, 2021 for treatment of uncontrolled type 1 diabetes with diabetic ketoacidosis and after she ran out of medication and presented with complaints of nausea and vomiting (Ex. B3F at 100-101, 103). **The claimant stabilized with treatment, she developed some side effects due to a high dose of Cymbalta and this was lowered to 30 mg, which the claimant tolerated well, she remained stable with acceptable blood sugar, compliance was discussed with the claimant, and she was discharged on July 31, 2021** (Ex. B3F at 100-101). In

addition, a July 29, 2021 echocardiogram showed a left ventricular ejection fraction of 55 to 60 percent (Ex. B17F at 21).

The claimant was admitted to Baptist Medical Center South intensive care unit for treatment of diabetic ketoacidosis again on August 23, 2021 after she reported smoking marijuana all weekend and waking up feeling disoriented and unwell with nausea and vomiting (Exs. B4F at 8, 73-74, B6F at 149). **The claimant's diabetic ketoacidosis resolved with treatment**, and she was transferred to the floor and was alert, awake, and oriented upon examination with no edema of her extremities (Exs. B4F at 73-74, B6F at 149). ...

On September 14, 2021, the claimant was readmitted to Baptist Medical Center South after she presented to the emergency room with persistent nausea and vomiting and was found to have diabetic ketoacidosis (Ex. B2F at 47-48). **The claimant had "not been taking any of her medications" and reported that she "decided to discontinue all of her medications" and had not taken insulin in three days** (Ex. B6F at 81-82). **The claimant's diabetic ketoacidosis resolved with treatment**, she was moved to the floor and placed on sliding scale insulin, and **gastroenterology recommended considering whether her nausea and vomiting was secondary to her regular marijuana use rather than diabetic ketoacidosis and did not recommend any interventions** (Ex. B2F at 48). The claimant was counseled about stopping marijuana and taking all her medications, and she was discharged on September 17, 2021 (Ex. B2F at 46-48). However, the claimant was readmitted **on September 25, 2021 for treatment of diabetic ketoacidosis, which resolved with treatment, she was educated on medication compliance, checking her blood glucose level, keeping a log, and following the directions on her insulin regimen** upon her discharge on September 30, 2021, and she was advised to follow up with primary care and endocrinology (Ex. B2F at 123). The claimant was alert, oriented, cooperative, and in no acute distress with **normal range of motion, normal strength, no tenderness, no swelling, normal motor function, no focal neurological deficits**, and an appropriate mood and affect upon her discharge (Ex. B6F at 11-12).

When the claimant was readmitted to Baptist Medical Center South for treatment of **diabetic ketoacidosis** on October 14, 2021, **which resolved with treatment**, Maria Azeem, M.D., who noted that **the claimant had Lantus and sliding scale insulin at home and was "able to afford it as well"** (Ex. B7F at 8). Dr. Azeem gave the claimant all the instructions for her medication regimen upon her discharge on October 17, 2021 (Ex. B7F at 8). Dr. Azeem also prescribed metoprolol, hydralazine, and labetalol for hypertension (Ex. B7F at 8). The claimant was alert, oriented, cooperative, and in no acute distress with clear lungs, a normal cardiovascular rate, a soft and nontender abdomen, normal range of motion, and an appropriate mood and affect upon her discharge (Ex. B7F at 8-9). The claimant was readmitted on October 28, 2021 after she presented not feeling well, lethargic, and nauseated (Ex. B9F at 5-6). **The claimant was found to have diabetic ketoacidosis and started treatment with intravenous insulin and**

fluids, her blood sugar improved, she was switched to Lantus, she remained **clinically stable, her mental status returned to normal, and she was discharged** on November 2, 2021 (Ex. B8F at 5-6).

About one month later, the claimant presented to Baptist Medical Center South again … on December 2, 2021 with symptoms of nausea and pain all over, was **admitted to for treatment of diabetic ketoacidosis, and "quickly responded" to treatment with intravenous insulin and fluids** (Ex. B10F at 9). The claimant was switched to Lantus insulin and transferred to the regular floor, and she remained clinically stable (Ex. B10F at 9). Discharge notes indicated that the claimant was also using marijuana, counseling was given, including to take insulin and other medications regularly, the claimant verbalized understanding, and she was discharged home on December 4, 2021 (Ex. B10F at 9). **The claimant's discharge diagnoses were diabetic ketoacidosis, noncompliance, diabetic neuropathy, and multiple previous hospital admissions for diabetic ketoacidosis from noncompliance** (Ex. B10F at 8).

...

The claimant was readmitted to Baptist Medical Center South on April 16, 2022 after she presented to the emergency room with complaints of fatigue and dizziness and reported that she had not been taking her Lantus over the past two days because she ran out (Ex. B12F at 4). The claimant was **assessed with diabetic ketoacidosis "secondary to not taking medications"** (Ex. B12F at 8) and started on intravenous fluids and an insulin drip (Ex. B12F at 4). The claimant's **diabetic ketoacidosis resolved with treatment**. Neetha Vadde, M.D. discussed medication assistance for the claimant with case management, and the claimant was discharged on April 19, 2022 (Ex. B12F at 18, 23-24).

On April 29, 2022, the claimant visited Baptist Health Physician Group to establish care with a primary care provider. The **claimant reported that she was "only randomly checking" her blood sugar instead of with meals or any other specific times** (Ex. B14F at 37). The claimant also reported experiencing neuropathy pain in her legs and feet and reported that Lyrica helped if she took two (Ex. B14F at 37). Upon examination, the **claimant's range of motion and strength were grossly normal with no joint swelling, her sensory and motor findings were grossly normal**, and she was alert, oriented, and cooperative with an appropriate mood and affect and normal judgment (Ex. B14F at 38). Savannah Giovane, M.D. advised the claimant to return to a carb ratio and continue Lantus, advised a diabetic diet, and advised her to follow up with endocrinology (Ex. B14F at 38). Dr. Giovane also noted that the claimant insisted on a neurology referral for electrodiagnostic testing, and she provided this referral and refilled Lyrica (Ex. B14F at 38). The claimant also admitted to occasional cannabis use, and Dr. Giovane advised the claimant that she must discontinue cannabis for Lyrica to be prescribed, which the claimant agreed to do (Ex. B14F at 38).

The claimant visited Montgomery Family Medicine Residency Program on May 19, 2022 for a follow up visit for suture removal following Nexplanon insertion and reported that she was feeling well and denied any fever or "other significant symptoms" (Ex. B23F at 61). The claimant was alert, oriented, and in no acute distress with **grossly normal range of motion and strength, no joint swelling, grossly normal sensory and motor findings**, an appropriate mood and affect, and normal judgment (Ex. B23F at 62).

On May 23, 2022, the claimant visited Baptist Health Neurological Clinic for evaluation of complaints of burning, numbness, and tingling in her bilateral legs (Ex. B22F at 22). The claimant reported that she did not have constant pain in her feet and instead occasionally had shooting pain in her feet (Ex. B22F at 22). The claimant was alert, oriented, pleasant, calm, cooperative, and dressed appropriately on examination, and she had **a stable gait, intact muscle strength and tone, intact deep tendon reflexes, intact vibratory and pinprick sensation and negative straight leg raising, and she had no swelling or edema in any extremity** (Ex. B22F at 23). The claimant did not appear overly anxious or depressed, her thought processes appeared intact and well organized, her memory was good, and she answered questions appropriately and correctly (Ex. B22F at 23). Kellie Bagi, C.R.N.P. started the claimant on amitriptyline for her lower extremity paresthesia, advised the claimant to maintain tight glucose control for her diabetes, and ordered imaging and electrodiagnostic testing (Ex. B22F at 23-24). A June 2022 MRI of the claimant's brain showed no significant intracranial abnormality (Ex. B20F at 47).

The claimant visited UAB Medicine Endocrinology & Diabetes on June 6, 2022 for follow up regarding her diabetes (Ex. B25F at 19). Vaishali Thudi, M.D. noted that the claimant had last been seen in January 2021 and had since had multiple admissions for diabetic ketoacidosis (Ex. B25F at 19). The **claimant admitted to drinking high sugar drinks and not checking her blood glucose consistently,** and the **claimant reported that she was "able to afford the libre 2" continuous glucose monitor and was planning to pay out of pocket** (Ex. B25F at 19). The claimant was alert and oriented with **no focal neurological deficits and a normal gait,** and she had a normal mood and affect (Ex. B25F at 20). Dr. Thudi noted that the claimant's A1C level had improved from 14 to 11.5, noted that her goal was below 6.5 without hypoglycemia, and noted that the claimant **continued to be noncompliant with glucose checks and correction boluses and continued to show "dietary indiscretion"** (Ex. B25F at 20). Dr. Thudi had a long discission about the claimant about the importance of maintaining glycemic control, reinforced that she needed to stay compliant with boluses, and adjusted her medication regimen (Ex. B25F at 21).

The claimant subsequently presented to the Baptist Medical Center South emergency room on June 29, 2022 with complaints of nausea, vomiting, lightheadedness, and lethargy (Ex. B20F at 45). The claimant reported that she had been out of Lantus for three days, **she was started on an insulin drip and diabetic**

**ketoacidosis protocol, and she was switched to non-intravenous insulin after she improved** (Ex. B20F at 45). The claimant's other medical problems were stable without any further intervention during her admission (Ex. B20F at 45). **The claimant reported that she had difficulty paying for her insulin, case management was involved for a medication voucher, versions of insulin that were available at a lower cost were prescribed**, the claimant was discharged on July 1, 2022, and she was advised to follow up with primary care and endocrinology (Ex. B20F at 41, 45). Upon her discharge, the claimant was alert, oriented, cooperative, and in no acute distress with **normal range of motion, normal strength, and normal motor function** (Ex. B20F at 46).

On July 13, 2022, electrodiagnostic testing showed mild to moderate distal symmetric length-dependent sensorimotor polyneuropathy that was primarily axonal (Ex. B22F at 20-21). When the claimant followed up at Baptist Health Neurological Clinic on July 25, 2022, she reported that she ran out of Lyrica since her last visit (Ex. B22F at 17). Nurse Bagi assessed the claimant with mild to moderate polyneuropathy consistent with diabetes, restarted her on Lyrica, increased her dosage of amitriptyline, and advised the claimant to take her medication as prescribed for pain (Ex. B22F at 18). Nurse Bagi also advised the claimant to continue to follow up with primary care and endocrinology for her diabetes (Ex. B22F at 18).

The claimant subsequently followed up with Dr. Thudi on July 26, 2022 and **reported that she was non-compliant with insulin and dealing with stress in her personal life** (Ex. B25F at 15). The claimant had **a normal gait, normal range of motion, and no focal central nervous system deficits** as well as a normal mood and affect (Ex. B25F at 16). Dr. Thudi noted that the claimant's A1C level had worsened to 12.5 and noted that while the claimant was "well aware" of her current insulin regimen, **she admitted to being "very noncompliant"** (Ex. B25F at 16). Dr. Thudi had a lengthy discussion with the claimant about the importance of glycemic control and noted that the claimant's last admission for diabetic ketoacidosis was from running out of insulin (Ex. B25F at 17).

On August 6, 2022, the claimant presented to Baptist Medical Center South with nausea and vomiting, was found to have diabetic ketoacidosis, was started on a diabetic ketoacidosis protocol with an insulin drip until her anion gap closed, was transferred to Lantus insulin and sliding scale insulin, progressed well with treatment, was eating and drinking adequately, and was discharged on August 8, 2022 (Ex. B20F at 21).

The claimant followed up with Dr. Thudi on September 27, 2022 (Ex. B25F at 12). The claimant's hemoglobin A1C level was 13.7, and Dr. Thudi noted that the claimant did not bring her logbook or glucometer and did not take her insulin regularly (Ex. B25F at 12). **Dr. Thudi noted that the claimant's diabetes was poorly controlled due to poor compliance and referred her for help form [sic] social services to help obtain her insulin** (Ex. B25F at 13).

The claimant visited Montgomery Family Medicine Residency Program on October 10, 2022 for complaints related to tonsilitis and denied any nausea, vomiting, fever, or diarrhea (Ex. B23F at 52). The claimant was alert, oriented, and in no acute distress with **normal range of motion and strength**, no swelling, an appropriate mood and affect, and normal judgment (Ex. B23F at 53).

The claimant also followed up at Baptist Health Neurological Clinic on October 25, 2022 and reported that her neuropathy had worsened, but **she reported that she had not filled her prescription for Lyrica**, and she denied any side effects from amitriptyline (Ex. B22F at 14). The claimant also **reported that her diabetes was improving** (Ex. B22F at 14). **Though the claimant's mother reported that the claimant needed assistance with stairs, the claimant's gait was stable upon examination, her muscle tone and strength were intact, her deep tendon reflexes were intact and symmetric, and she had no clubbing or cyanosis of her extremities** (Ex. B22F at 15). Nurse Bagi **restarted the claimant on Lyrica and advised her to contact their office if she had any issues obtaining this medication** (Ex. B22F at 15). The claimant was also interested in physical therapy, and Nurse Bagi referred her for physical therapy (Ex. B22F at 15).

The claimant subsequently presented to Baptist Medical Center South on November 28, 2022 with complaints of nausea, vomiting, weakness, and shortness of breath starting three days previously and **reported that she had not been taking her insulin, and her risk factors included noncompliance** (Ex. B15F at 1, 76). The claimant's hemoglobin A1C level was 12.7 on her admission, and progress notes indicated that she had **"questionable compliance" with her home medications** (Ex. B15F at 18). **Though the claimant reported compliance with insulin, treatment notes indicated that she had "not picked up any since July 2022 from pharmacies she provided"** (Ex. B15F at 20). The claimant also **had medications with her that had apparently not been refrigerated** (Ex. B15F at 20). On admission, the claimant was found to be hyperglycemic, acidotic, and leukocytotic (Ex. B15F at 77). The claimant received treatment with a diabetic ketoacidosis protocol (Ex. B15F at 6), **her diabetic ketoacidosis resolved**, she was transitioned to sliding scale insulin with oral intake, and her blood sugar remained controlled with this treatment (Ex. B15F at 58, 77). The claimant also attended a physical therapy initial evaluation during her hospitalization on November 29, 2022 and had a rolling walker during the visit (Ex. B15F at 52-53). However**, treatment notes indicated that the claimant presented with good seated balance, her strength and range of motion were within functional limits, she was able to ambulate 200 feet without physical assistance and did not require use of an assistive device to do this, she demonstrated "good balance with steady pace," and she was discharged from physical therapy "due to no acute mobility needs at this time"** (Ex. B15F at 53). The claimant **continued to tolerate ambulation after her discharge from physical therapy** (Ex. B15F at 61), she was discharged on December 2, 2022 (Ex. B15F at 1, 77), and discharge notes indicated that she **continued to "ambulate on her own without issue" upon her discharge** (Ex. B15F at 68). **Refills of her insulin were sent to the Baptist Tower to be**

**obtained through the Tower of Hope program** (Ex. B15F at 77). The claimant was instructed to keep a blood sugar log to bring to her follow up appointments so it could be reviewed and changes could be made to her insulin regimen if needed (Ex. B15F at 77).

The claimant followed up with Dr. Thudi on December 27, 2022 (Ex. B25F at 10). Dr. Thudi noted that the **claimant continued to "stay noncompliant" with insulin injections, admitted to being busy at work and not checking her blood sugars or doing carb counts, and had not reached out to her social worker to get additional support** (Ex. B25F at 10). Dr. Thudi adjusted the claimant's medication regimen, **provided paperwork for patient assistance for insulin and diabetic supplies,** and had a lengthy discussion with the claimant about the complications of uncontrolled diabetes (Ex. B25F at 11).

The claimant subsequently presented to the Baptist Medical Center South emergency room on January 6, 2023 with complaints of vomiting for one day and being thirsty for two days, and the claimant was lethargic and noncommunicative on examination (Ex. B16F at 34-35). In the emergency room, the claimant's blood sugar level was 615 with a high acetone level and three plus glucose in urine analysis, she received treatment for diabetic ketoacidosis with intravenous insulin and fluids, her anion gap closed twice, and she was successfully transitioned to Lantus and sliding scale insulin (Ex. B16F at 35). The claimant remained stable throughout her admission, she tolerated her diet and improved to the point that she was stable for discharge on January 8, 2023, and **she was advised to take her medication**, log her blood sugar, and bring her blood sugar log to her follow up appointment with her primary care provider (Ex. B16F at 35).

On January 13, 2023, the claimant **attended a session of outpatient physical therapy, and she walked into the clinic without an assistive device** (Ex. B17F at 1-2). When the claimant returned on January 18, 2023, she reported that she did not feel well, started to slump, was assisted to supine, and was taken to the emergency room (Ex. B17F at 6), where she was admitted and received treatment with intravenous fluids and insulin per diabetic ketoacidosis protocol (Ex. B17F at 22). The claimant's hemoglobin A1C level was more than 12 percent, which Mine Tawadrous, D.O. noted suggested **"poor adherence,"** Dr. Tawadrous discussed follow up with primary care and endocrinology (Ex. B17F at 79), and the claimant was discharged on January 22, 2023 (Ex. B17F at 16, 22).

...

The claimant was **readmitted** on February 7, 2023 for treatment of diabetic ketoacidosis **"likely due to medication noncompliance,"** she was started on ferrous sulfate three times a week for iron deficiency anemia, she was discharged on February 10, 2023 after she **improved with treatment**, and she was advised to restart her home medication of Lyrica for diabetic neuropathy (Ex. B19F at 34-35, 37, 44, 54). A transthoracic echocardiogram also showed a left ventricular ejection

fraction of 65 to 70 percent (Ex. B19F at 2). **Nicole Davis, M.D. also reached out to a care advisor during the claimant's hospitalization for assistance with obtaining insulin for the claimant until she was able to complete documents for a patient assistance program** (Ex. B19F at 44).

On February 14, 2023, the claimant followed up with Dr. Thudi and reported that her **blood sugars had improved recently as she had cut down her carbs and was taking her medication** (Ex. B25F at 6-7). Dr. Thudi observed that the claimant was alert and oriented with a normal mood and affect, **no focal central nervous system deficits, normal range of motion, and a normal gait**, and she adjusted the claimant's medications (Ex. B25F at 6-7).

On February 17, 2023, the claimant visited the Montgomery Family Medicine Residency Program and reported that **she had adjusted her diet and stopped snacking throughout the day, she was using a continuous glucose monitor, and she had been doing a "much better job" with her blood glucose level, including checking it** (Ex. B23F at 25). The claimant also reported that she had been eating breakfast every day and had been waking up in a "much better mood in general" (Ex. B23F at 25). The claimant requested a prescription for a rollator walker and reported easy fatigue while doing errands (Ex. B23F at 25). The claimant was alert and in no acute distress with **normal range of motion, normal strength, and no edema**, and she was cooperative with an appropriate mood and affect (Ex. B23F at 26). Patricia Hughes, D.O. **praised the claimant for her "increase in medical compliance" and change in diet, noted that the claimant's diabetes was improved,** and advised her to follow up with endocrinology and continue her "path to better blood glucose control, lower A1C, and better health" (Ex. B23F at 26). Dr. Hughes also noted that the claimant's reports of **fatigue were also likely due to physical deconditioning, prescribed a rollator walker**, and referred her to physical therapy (Ex. B2F at 27).

When the claimant followed up at Baptist Health Neurological Clinic on March 27, 2023, she **reported some improvement in her neuropathy since her last visit, reported that her diabetes had improved, which lessened the severity of her pain, and denied any side effects from Lyrica or amitriptyline** (Ex. B22F at 1). The claimant's **gait was stable upon examination, her muscle tone and strength were intact, her deep tendon reflexes were intact and symmetric, and she had no clubbing or cyanosis of her extremities** (Ex. B22F at 2). Nurse Bagi increased the claimant's dosage of amitriptyline, continued her on Lyrica, and **advised her that continued improvement in her diabetic control would likely also improve her diabetic neuropathy** (Ex. B22F at 2).

The claimant returned to Montgomery Family Medicine Residency Program on March 29, 2023 and reported that she **was doing well for the most part with some continued blood sugar control issues** (Ex. B23F at 7). The claimant was alert, oriented, and in no acute distress **with normal range of motion, normal strength, no swelling**, and appropriate mood and affect, and normal judgment upon

examination (Ex. B23F at 8). The claimant attended a physical therapy outpatient evaluation on April 10, 2023, reported feeling easily fatigue[d] with light output, arrived with a four-wheel walker, and was "upbeat" and "eager to get started" (Ex. B24F at 1-2).

On April 13, 2023, the claimant followed up with Dr. Thudi at UAB Medicine Endocrinology & Diabetes for outpatient follow up regarding her diabetes (Ex. B25F at 1). Dr. Thudi noted that the claimant had been sleeping during the daytime and staying awake overnight, **she had been eating high carbohydrates at night and missing boluses of insulin, and she was not compliant with monitoring her home blood glucose level** (Ex. B25F at 1). The **claimant admitted to being noncompliant with her correction and carb boluses of insulin and reported that she was constantly snacking without doing any Humalog boluses** (Ex. B25F at 2). Dr. Thudi had a lengthy discussion about the importance of glycemic control with the claimant and recommended glucose checks before each meal and bedtime, provided medication samples, and adjusted the claimant's medications (Ex. B25F at 2-3).

(Tr. 97-105) (emphasis added).

The ALJ then determined that the record as a whole did not support Plaintiff's allegations

of disabling symptoms and limitations:

Regarding her diabetes, the medical record repeatedly documents that the claimant's hospitalizations for diabetic ketoacidosis were due to medication noncompliance (Exs. B10F at 8, B12F at 8, B15F at 18, B17F at 79, B19F at 24, 34, 44, 51, B25F at 1-2, 9-10, 12, 15, 17, 19), and the claimant responded "quickly" (Ex. B10F at 9) to treatment with insulin during her hospitalizations. Though the claimant testified that she was not compliant with her medication because she could not afford it, this is not entirely consistent with the record overall, which documents that the claimant remained noncompliant with her diabetes medication despite the availability of and receiving help with obtaining her medications through patient assistance programs, and she remained noncompliant with her diabetes medications as well as other aspects of her diabetic treatment plan, including noncompliance with a diabetic diet and as well as with checking and recording her blood glucose level as directed. In July 2021, the claimant reported that she was not checking her glucose regularly (Ex. B2F at 30). In September 2021, the claimant had "not been taking any of her medications" and reported that she "decided to discontinue all of her medications" (Ex. B6F at 81-82). The claimant's mother noted that the claimant was able to afford her insulin in October 2021 (Ex. B7F at 8). In April 2022, Dr. Vadde discussed medication assistance for the claimant with case management (Ex. B12F at 18, 23-24), and when the claimant established care with a primary care provider in April 2022, the claimant reported that she was "only randomly checking" her blood sugar instead of with meals or any other specific times as directed (Ex. B14F at 37). When the claimant visited outpatient endocrinology for

the first time within the relevant period in June 2022, over a year after the alleged onset date, the claimant admitted to drinking high sugar drinks and not checking her blood glucose consistently, reported that she was "able to afford" a continuous glucose monitor, and did not report difficulty affording her medication, and Dr. Thudi noted that the claimant continued to be noncompliant with glucose checks and correction insulin boluses and continued to show "dietary indiscretion" (Ex. B25F at 19-20). When the claimant reported that she had difficulty paying for her insulin later in June 2022, case management was involved for a medication voucher and versions of insulin that were available at a lower cost were prescribed (Ex. B20F at 41, 45). When the claimant followed up with her endocrinologist in July 2022, the claimant admitted to being "very noncompliant" and cited stress in her personal life rather than difficulty affording her medication (Ex. B25F at 15-16). The claimant did not bring her logbook or glucometer and reported that she did not take her insulin regularly when she followed up with Dr. Thudi in September 2022, and Dr. Thudi assessed her with poor compliance and referred her for help form [sic] social services to help obtain her insulin (Ex. B25F at 12-13). Though the claimant subsequently reported compliance with insulin during her November 28, 2022 hospitalization to treat diabetic ketoacidosis, treatment notes indicated that she had not picked up her medication since July 2022 (Ex. B15F at 20), and refills of her insulin were sent to the Baptist Tower to be obtained through the Tower of Hope program (Ex. B15F at 77). However, even after receiving this additional medication assistance, when the claimant followed up with Dr. Thudi on December 27, 2022, Dr. Thudi noted that the claimant continued to "stay noncompliant" with insulin injections, admitted to being busy at work and not checking her blood sugars or doing carb counts, and had not reached out to her social worker to get additional support with obtaining her medications, and Dr. Thudi provided the claimant with paperwork for patient assistance for insulin and diabetic supplies (Ex. B25F at 10-11). Over a month later, Dr. Davis also reached out to a care advisor in February 2023 for assistance with obtaining insulin for the claimant until she completed documents for a patient assistance program (Ex. B19F at 44). When the claimant reported later in February 2023 that she had cut down her carbs and was taking her medication, she also reported that her blood sugars had improved (Ex. B25F at 6-7). The claimant also reported to Dr. Hughes that she had adjusted her diet and stopped snacking throughout the day, she was using a continuous glucose monitor, and she had been doing a "much better job" with her blood glucose level, including checking it, and Dr. Hughes noted that the claimant's diabetes had improved with this increase in compliance with her treatment plan (Ex. B23F at 25). However, the claimant remained noncompliant in her most recent visit with outpatient endocrinology in April 2023 and admitted that she had been eating high carbohydrates, she was "constantly snacking" without doing any Humalog boluses, and she was not compliant with monitoring her home blood glucose level as directed (Ex. B25F at 1-2). The claimant's exacerbations in her diabetes appear to be based upon noncompliance with her medication as well as with noncompliance with other aspects of treatment plan documented over the course of the relevant period despite assistance with obtaining her medications, and the medical record shows that her diabetes responded favorably to increases in

compliance with her diabetes treatment plan recommended by her endocrinologist and primary care provider (Ex. B23F at 25, 25F at 1-2).

Regarding her diabetic neuropathy, electrodiagnostic testing showed neuropathy in the mild to moderate range (Ex. B22F at 20-21), and the claimant reported that Lyrica was helpful for treating her neuropathy (Ex. B14F at 37), though she also reported at times that she was not taking her prescription for Lyrica (Ex. B22F at 14, 17-18) and was advised to contact her neurologist for assistance if she had any issues obtaining this medication (Ex. B22F at 15). The claimant reported improvement in her diabetic neuropathy with improvement in her diabetic control with increased compliance in March 2023 and denied side effects from Lyrica or amitriptyline (Ex. B22F at 1-2). The claimant was also advised in recent treatment notes that continued improvement in her diabetic control would likely also improve her diabetic neuropathy (Ex. B22F at 2). In addition, the medical record does not support the conclusion that a walker was medically necessary or expected to be medically necessary for 12 consecutive months. The claimant regularly exhibited normal strength, tone, range of motion, reflexes, coordination, and gait over the course of the relevant period (Exs. B22F at 2, 15, 23, B25F at 6-7, 16, 20) as well as intact vibratory and pinprick sensation on neurological exam (Ex. B22F at 23). Though the claimant had a rolling walker[,] a physical therapy initial evaluation during her November 29, 2022 hospitalization, on examination, her strength and range of motion were within functional limits, she was able to ambulate 200 feet without physical assistance and did not require use of an assistive device to do this, she demonstrated "good balance with steady pace," and she was discharged from physical therapy "due to no acute mobility needs at this time" (Ex. B15F at 52-53). The claimant continued to tolerate ambulation after her discharge from physical therapy (Ex. B15F at 61), and hospital discharge notes indicated that she continued to "ambulate on her own without issue" upon her discharge (Ex. B15F at 68). On January 13, 2023, the claimant attended a session of outpatient physical therapy, and she walked into the clinic without an assistive device (Ex. B17F at 1-2). While the claimant requested a prescription for a rollator walker from her primary care provider on February 17, 2023 and received one, she did not exhibit an unstable or unsteady gait and had normal strength and range of motion, no focal neurological deficits, and no edema on examination (Ex. B23F at 25-27), which does not support the conclusion that this prescription was expected to be medically necessary for 12 consecutive months, and she had a normal gait with no focal neurological deficits three days earlier on February 14, 2023 (Ex. B25F at 6). On March 27, 2023, the claimant's gait was stable upon examination, her muscle tone and strength were intact, her deep tendon reflexes were intact and symmetric, and she had no clubbing or cyanosis of her extremities (Ex. B22F at 2). The claimant also had normal range of motion, normal strength, and no swelling upon examination on March 29, 2023 (Ex. B23F at 8). Therefore, the undersigned finds that a walker was not medically necessary for 12 consecutive months and is not expected to be medically necessary for 12 consecutive months. The claimant also received routine treatment for her hypertension and anemia over the course of the relevant period (Exs. B7F at 8, B18F at 2, B19F at 44, 51, B23F at 48), and the medical record does not support

the conclusion that these conditions caused disabling functional limitations that lasted or were expected to last for 12 consecutive months. Furthermore, though the claimant testified to debilitating medication side effects, the medical record does not document this extent of medication side effects lasting or expected to last for 12 consecutive months. Though the claimant developed some side effects due to a high dose of Cymbalta in July 2021, her dosage was lowered to 30 mg, which the claimant tolerated well (Ex. B3F at 100-101). The claimant subsequently denied side effects from amitriptyline in October 2022 (Ex. B22F at 14) and from Lyrica or amitriptyline in March 2023 (Ex. B22F at 1) and testified that her side effects from her heart medication improved after her dosage of heart mediation was adjusted.

(Tr. 105-07).

As to Plaintiff's argument that the ALJ failed to develop the record by not obtaining a consultative medical examination, the ALJ was under no duty to do so. An ALJ "is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1269 (11th Cir. 2007); *Castle v. Colvin*, 557 F. App'x 849, 853 (11th Cir. 2014) ("The ALJ 'has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the [ALJ] to make an informed decision.'") (citation omitted). The "[o]rdering [of] a consultative examination is a discretionary matter for the ALJ and would be sought 'to try to resolve an inconsistency in the evidence or when the evidence as a whole is insufficient to support a determination or decision' on the claim." *Banks for Hunter v. Comm'r, Soc. Sec. Admin.*, 686 F. App'x 706, 713 (11th Cir. 2017) (citation omitted); 20 C.F.R §§ 404.1519a(b), 416.919a(b) ("We may purchase a consultative examination to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim."). As shown above, the ALJ had sufficient evidence to assess Plaintiff's claims and determine her RFC, and Plaintiff has failed to show that there were any evidentiary gaps in

the record resulting in unfairness or clear prejudice. A consultative examination thus was not necessary. *See Gentle v. Kijakazi*, No. 8:21-CV-2900, 2023 WL 2446609 at *4 (M.D. Fla. Mar. 10, 2023) ("[T]he mere lack of a consultative examination is inadequate to meet a plaintiff's burden to demonstrate prejudice. ...  Rather, a plaintiff must show the ALJ's decision would have been impacted by a consultative examination.") (citations omitted); *Schrimpsher v. Kijikazi*, No. 4:21-CV-472, 2022 WL 16924102 at *3 (N.D. Ala. Nov. 14, 2022) ("[Plaintiff] hasn't pointed to any evidentiary gaps in the record, and he was represented during the administrative process, so he had a duty to produce evidence related to his disability.  Plus, [Plaintiff] can only speculate that a consultative exam ... would provide evidence that supported his claim of disability. Speculation isn't a basis for an ALJ to order a consultative exam.") (internal citation omitted).

To the extent Plaintiff suggests that the ALJ needed to order a consultative examination because she had diabetes, she fails to cite any authority showing that the presence of a particular condition or impairment requires an ALJ to order a consultative examination.  Here, the record as a whole is neither incomplete nor inadequate.  Instead, the record was sufficient for the ALJ to evaluate Plaintiff's impairments and functional ability, and it does not contain the kind of gaps required to demonstrate prejudice.  As reflected by the ALJ's extensive discussion of the record, the ALJ did not need to seek a consultative examination to reach an informed decision.  *See Kever v. O'Malley*, No. 2:23-CV-626, 2024 WL 2239738 at *3 (M.D. Ala. May 17, 2024) ("It is [the plaintiff's] burden to show that she is disabled, and her mere speculation that a consultative examination would have shown that she is more limited than her RFC is not sufficient to remand her disability application to the Commissioner."); *Slocumb v. Comm'r of Soc. Sec.*, No. 5:16-CV-617, 2017 WL 2889804 at *4 (M.D. Fla. May 15, 2017) ("[T]he only purported prejudice that Plaintiff points to in her brief is the lack of a consultative psychological examination

... but it is Plaintiff's duty to show *how* the ALJ's failure to obtain a psychological examination prejudiced her[.] [T]he mere lack of a consultative examination is inadequate to meet Plaintiff's burden when the record contains sufficient evidence to determine whether she is disabled.") (emphasis in original).  Accordingly, considering the record as a whole, the court finds that the ALJ's disability determination was supported by substantial evidence.

## V.    Conclusion

After carefully and independently reviewing the record, and for the reasons stated above, the court concludes as follows:

- that Plaintiff's motion for summary judgment (Doc. 10) is due to be **DENIED**;

- that the Commissioner's motion for summary judgment (Doc. 11) is due to be **GRANTED**; and

- that the Commissioner's decision is due to be **AFFIRMED**.

A separate judgment will issue.

**DONE** this the 18th day of July 2024.

_____
**CHAD W. BRYAN**
**UNITED STATES MAGISTRATE JUDGE**